J-S19003-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

IN RE: D.K.M., A MINOR

APPEAL OF: D.M.-K., MOTHER

:
:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 349 MDA 2023

Appeal from the Order Entered February 23, 2023
In the Court of Common Pleas of Lycoming County Orphans' Court at
No(s): 2022-6825

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED SEPTEMBER 5, 2023**

D.M.-K. (Mother) appeals from the order entered on February 23, 2023, that granted Lycoming County Children & Youth Services' (Agency) petition to involuntarily terminate Mother's parental rights to D.K.M., born in June of 2015.[1]  Following our review, we affirm the order on appeal.

The orphans' court provided a detailed recitation of the facts and procedural history of this case, which we need not reproduce herein.  ***See*** Orphans' Court Opinion and Order (OCOO), 2/23/23, at 1-7.  Essentially, D.K.M. was removed from Mother's care in May of 2021 based on evidence that Mother was using drugs and was unfit to care for D.K.M.[2]  In June of

_____

[1] D.K.M.'s father is deceased.

[2] We note that the record indicates Mother has four other children in addition to D.K.M.  However, those children are not involved in this dependency proceeding.

2021, D.K.M. was adjudicated dependent and the Agency was granted legal and physical custody of the child. Over the ensuing two years, the Agency attempted to work with Mother to resolve the issues that led to D.K.M.'s adjudication of dependency to no avail. Ultimately, in August of 2022, the Agency filed a petition to involuntarily terminate Mother's parental rights to D.K.M. After a hearing on January 13, 2023, the orphans' court granted the Agency's petition.

Mother filed a timely notice of appeal, as well as a concise statement of the errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The orphans' court filed a responsive opinion indicating that it was relying on the rationale set forth in its February 23, 2023 order and opinion granting the Agency's petition. Herein, Mother presents four issues for our review:

> I. Whether the [orphans'] court erred in terminating Mother's parental rights when she has not failed to perform parental duties for a period of six months and has made every effort to have a relationship with her child.
>
> II. Whether the [orphans'] court erred in terminating Mother's parental rights because the evidence established that Mother had made substantial progress to remedy her prior incapacity and is able to provide the child with the essential parental care, control, and subsistence necessary for his physical and mental well-being.
>
> III. Whether the [orphans'] court erred in terminating Mother's parental rights because the conditions that led to the removal or placement of the child do not continue to exist and the needs and welfare of the child would not be served by the termination of Mother's parental rights.
>
> IV. Whether the [orphans'] court erred in terminating Mother's parental rights because the best interests of the child are not served by termination.

Mother's Brief at 6-7.

We review an order terminating parental rights in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511; other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

In Mother's issues on appeal, she essentially avers that the orphans' court erred by concluding that the Agency demonstrated, by clear and convincing evidence, that she had a settled purpose of relinquishing her parental claim to D.K.M., that she has voluntarily failed to perform her parental duties, and that she has not done the work necessary to overcome the obstacles of her addiction and mental health issues. Mother stresses that she has now "been in treatment for a lengthy period of time and will continue treatment in an intensive outpatient program." Mother's Brief at 20. She

explains that, while in treatment, "[s]he has received substantial therapy for her mental health and is taking psychiatric medication." *Id.* Mother further claims that "[s]he has developed the appropriate parenting skills to provide D.K.M. with the necessary physical and mental well-being that he needs to thrive." *Id.* She concludes that, because she "is no longer incapacitated and … she has developed the skill set to properly parent D.K.M., the [orphans'] court erred in terminating her parental rights." *Id.* at 13. Mother further insists that it is not in D.K.M.'s best interest that her rights be terminated, especially because "he will be the only one of his siblings to be removed from his family." *Id.*

In reviewing Mother's arguments, we have considered the briefs of the parties, the certified record, and the applicable law. We have also assessed the detailed and well-reasoned opinion of the Honorable Ryan M. Tira of the Court of Common Pleas of Lycoming County. Judge Tira's opinion thoroughly explains the basis for his conclusion that the Agency established, by clear and convincing evidence, that Mother's parental rights with respect to D.K.M. should be involuntarily terminated pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). *See* OCOO at 7-17. Additionally, Judge Tira provides a comprehensive discussion to support his conclusion that the Agency established, by clear and convincing evidence, that the termination of Mother's parental rights would not cause irreparable harm to D.K.M. and that his developmental, physical, and emotional needs and welfare will best be served by termination of Mother's parental rights. *See* 23 Pa.C.S. § 2511(b); OCOO

at 17-20.  Notably, Judge Tira recognizes that Mother entered in-patient treatment and has received therapy, medication, and parenting classes.  ***See*** OCOO at 16.  The judge then explains why Mother's recent efforts and progress do not overcome the evidence demonstrating that the statutory grounds for termination have been met, and that termination will best serve the needs and welfare of D.K.M.  ***See id.*** at 16-17.  The record confirms that Judge Tira's decisions regarding both sections 2511(a) and (b) are supported by ample, competent evidence.  Therefore, we adopt his opinion as our own, and affirm the order granting the Agency's petition to involuntarily terminate Mother's parental rights for the reasons set forth therein.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/05/2023

Received 4/5/2023 1:35:43 PM Superior Court Middle District

Filed 4/5/2023 1:35:00 PM Superior Court Middle District
349 MDA 2023

# APPENDIX

519003-23

TCO

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY,
PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE:
**D. K. M.**
~~DEJAHN KELLAM-MURRAY~~
**Minor child**

:  NO. 2022-6825
:
:
:
:

### OPINION AND ORDER

AND NOW, this 22nd day of February, 2023, before the Court is Lycoming

County Children & Youth Services' ("Agency") Petition for Involuntary Termination of

**D.M. - K.**

Parental Rights of ~~Donuae Murray-Kellam~~ ("Mother") filed on August 18, 2022, with

**D.K.M.**

regard to ~~Dejahn Kellam-Murray~~ ("Child"). A hearing on the Petition for Involuntary

Termination of Parental Rights was held on January 13, 2023. Mother appeared and

was represented by Jeana Longo, Esquire. John Pietrovito, Esquire, Solicitor for the

Agency, and Angela Lovecchio, Esquire, Guardian Ad Litem, and Trisha Hoover Jasper,

Esquire, counsel for the Child, were also present at the hearings. The biological father

**D.K.M.**        **A.K**

of ~~Dejahn, Anthony Kellam~~, is deceased.

### Findings of Facts

**D.K.M.**                                                                              **D.M.-K**

~~Dejahn Kellam-Murray~~ was born on June 26, 2015. He is the child of ~~Donuae~~

**A.K.**

~~Murray-Kellam~~, date of birth March 25, 1986, and ~~Anthony Kellam~~, who is deceased.

On May 19, 2021, the Agency requested and was verbally granted emergency

custody of the Child after receiving a video showing Mother "sleeping" while holding a

sobbing infant who was struggling to get his head out from under blankets. The infant in

the video is the sibling of the Child. The Agency requested Mother to present for a drug

screen due to concerns observed in the video. Mother admitted she used Xanax and

cocaine on the date the video was taken, but refused to take the drug screen requested by the Agency. During a second phone call on May 19, 2021, Mother admitted that she used illegal substances that morning, thereby prompting the Agency to conduct a home visit to assess the situation. During the home visit, Mother was observed to be impaired on drugs and mentally unstable. She wielded a knife and threw a stroller at Agency workers. The Court granted verbal emergency custody of Mother's four children. After mental health assessment workers conducted a welfare check on Mother, she was evaluated at UPMC Williamsport Emergency Room and ultimately involuntarily committed.

A Shelter Care hearing was held on May 21, 2021. Mother did not attend. Following the hearing, the Court found that sufficient evidence was present to prove that release of the Child to Mother was not in the Child's best interest. Legal and physical custody of the Child remained with the Agency, with the Child's placement to remain in Kinship Care.

A Dependency hearing was held on June 1, 2021, after which the Court adjudicated the Child dependent and determined that he was without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals. As the Court found that allowing the Child to remain in the home would be contrary to his welfare, legal and physical custody of the Child was ordered to remain with the Agency. The Court directed Mother to submit to random drug testing by the Agency when she was released from rehab/incarceration, and required her to sign releases as requested by the Agency with regard to her treatment providers.

2

A permanency review hearing was held on September 29, 2021. The Court noted that there had been minimal compliance with the permanency plan and no progress toward alleviating the circumstances which necessitated the original placement, in that during this review period Mother was transferred from jail to Roxbury Treatment Center for inpatient drug and alcohol treatment. When she entered treatment, Mother tested negative for all substances. However, four days after entering treatment Mother tested positive for buprenorphine twice and was unsuccessfully discharged and re-incarcerated. She was released from incarceration on August 20, 2021. Mother's Outreach services were closed during this review period due to her incarceration. Mother was evaluated by West Branch Drug and Alcohol Abuse Commission, and a report provided from them outlined various recommendations, none of which were addressed by Mother. Mother refused to take a drug test at the time of the review hearing. Mother no-showed an appointment for a mental health evaluation with Dr. Denise Feger of Crossroads Counseling. Mother's last visit this review period was August 30, 2021, and she was placed on call-in status, which required her to call the Agency between 8:00 a.m. and 8:30 a.m. the morning of her visit to confirm her attendance. Mother indicated she did not agree with this rule and chose to forego her visits with the Child rather than call in. During this review period, the Child had extensive dental procedures done, including having seven teeth pulled as a result of dental neglect. Following the hearing, the Court reaffirmed dependency and the Child remained in the legal and physical custody of the Agency with continued placement in his kinship care home.

A permanency review hearing was held on December 23, 2021. The Court found that there had been no compliance with the permanency plan by Mother and no

3

progress towards alleviating the circumstances which necessitated the original placement. During the review period, Mother continued to struggle with drug and alcohol use. She admitted to using cocaine and West Branch had a bed on hold for Mother for inpatient treatment, but she did not follow through. Outreach services were re-referred on September 13, 2021, for employment, budgeting, maintaining housing, and parenting support. Mother attended only two out of five scheduled appointments  Mother attended two out of twenty visits with the Child this review period, and no-showed the other 18 visits. Following the hearing, the Court reaffirmed dependency and legal and physical custody of the Child remained with the Agency for continued placement in his current kinship care home.

A permanency review hearing was held on March 23, 2022. The Court found that Mother had no compliance with the permanency plan and made no progress towards alleviating the circumstances which necessitated the original placement.  On January 28, 2022, Mother's home was raided and her probation was revoked and she was incarcerated until the morning of the review hearing. She attended one appointment with Outreach services this review period before they were closed on February 2, 2022, due to her incarceration. Mother attended one out of eight visits with the Child during this review period and no-showed the other seven. Following the hearing, the Court reaffirmed dependency and legal and physical custody of the Child remained with the Agency for continued placement in her current foster home.

On June 23, 2022, the Agency filed a Motion for Modification of the Child's Placement, requesting that he be removed from the kinship care resource home, as the resource parents were unable to offer permanency. The Court granted the Motion on June 30, 2022, and the Child was placed in his current resource home. On July 28,

4

2022, the Agency filed a Motion for Finding of Aggravated Circumstances, alleging that Mother has failed to maintain substantial and continuing contact with the Child for a period of six months.

A permanency review hearing was held on August 12, 2022. The Court found that Mother had no compliance with the permanency plan and made no progress towards alleviating the circumstances which necessitated the original placement. Mother was released from incarceration on May 4, 2022. Mother continued to have no involvement with any programs or treatment to address her drug and alcohol concerns, and refused to take any drug tests when requested by the Agency. Mother agreed to obtain a West Branch Drug and Alcohol evaluation, but did not attend the appointment and refused out patient treatment. Mother was not employed, and had not attended any medical or dental appointments for the Child during the review period. Mother attended no visits with the Child during the review period, and was found to not have attended a visit since January 19, 2022. Following the hearing, the Court reaffirmed dependency and legal and physical custody of the Child remained with the Agency for continued placement in his current foster home. Additionally, the Court found that aggravated circumstances had been proven as Mother had failed to maintain substantial and continuing contact with the Child for a period of six months, and ordered that no reasonable efforts were to be made to preserve the family and reunify the Child with Mother.

The Agency filed it's Petition for Involuntary Termination of Parental Rights on August 18, 2022. A Petition for Change of Goal to Adoption was also filed on this date.

A permanency review hearing was held on September 14, 2022. The Court found that Mother had no compliance with the permanency plan and made no progress

5

towards alleviating the circumstances which necessitated the original placement. Mother did not attend as she entered inpatient substance abuse treatment on September 8, 2022. Prior to entering this facility, Mother was not in any program to address drug and alcohol concerns during the review period. Mother continued to have unresolved DUI charges in Lycoming County, and was not employed. Mother had attended no visits with the Child during this review period. At the review hearing, Mother requested to either to have the Child reside with her or visit her at the treatment program. The Court denied Mother's requests for visits with the Child but indicated that she could file a petition for visitation after she had engaged in a period of treatment. The Court encouraged Mother to provide letters, cards, etc. to the Agency to be shared with the Child. Following the hearing, the Court reaffirmed dependency and legal and physical custody of the Child remained with the Agency for continued placement in his current foster home.

On October 6, 2022, Mother's counsel filed a Petition to Permit/Reinstate Visitation, indicating Mother had been at the facility for thirty days and was actively participating in programming to address drug and alcohol concerns and improve her parenting skills. A hearing was held on November 9, 2022, after which the Court granted Mother's Motion, but limited any contact between Mother and the Child to visits via Zoom, one time every other week.

A permanency review hearing was held on December 16, 2022. The Court found that Mother had minimal compliance with the permanency plan and made no progress towards alleviating the circumstances which necessitated the original placement. Mother was at Guadenzia House, Fountain Springs, for in-patient treatment during this review period. Mother sent one letter to the Child shortly after she entered the treatment

6

facility in September of 2022. Mother had two video visits with the Child pursuant to this Court's Order of November 9, 2022, but the Child was described as "detached" during these visits. Mother requested additional visits with the Child at this review hearing but the request was denied. This caused Mother to accuse the Family Court Hearing Officer, CYS, and the court system had treated her unfairly because of her race. Mother indicated she would not participate in the hearing on the Agency's Petition for Involuntary Termination of Parental Rights but was encouraged to reconsider by the Hearing Officer. Following the hearing, the Court reaffirmed dependency and legal and physical custody of the Child remained with the Agency for continued placement in his current foster home.

The Agency's Petition for Involuntary Termination alleges termination is warranted under 23 Pa.C.S. §2511(a)(1), (2), (5), and (8). The hearing on the Petition was held on January 13, 2023.

## *Discussion*

The Agency argues that the basis for termination in this case may be found in 23 Pa.C.S. §2511(a)(1), (2), (5) and (8), which provides as follows:

§2511. Grounds for Involuntary Termination

(a) GENERAL RULE.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

7

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

In order to involuntarily terminate Mother's parental rights, the Agency must prove by clear and convincing evidence one of the above subsections of 23 Pa.C.S. §2511(a).

A court may terminate parental rights under Section 2511(a)(1) where a parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least six months prior to the filing of the termination petition. **In the Interest of C.S.**, 761 A.2d 1197, 1201 (Pa. Super. 2000) (emphasis added). The orphans' court must then consider the parent's explanation for his or her abandonment of the child, in addition to any post-abandonment contact. **In re Adoption of C.J.A.**, 204 A.3d 496, 503 (Pa. Super. 2019). When determining whether to terminate the rights of a parent, the Court should consider the entire background of the case and not simply:

mechanically apply the six month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of [her] . . . parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

**In re: B.N.M.**, 856 A.2d 847, 855 (Pa. Super. 2004), appeal denied, 872 A.2d 1200 (Pa. 2005) citing **In re: D.J.S.**, 737 A.2d 283, 286 (Pa. Super. 1999).

8

Heather Wood, Specialized Services Supervisor for the Agency, testified that Mother was originally scheduled for two supervised visits per week for one hour each. On September 20, 2021, Mother was placed on call-in status, meaning that she must call the Agency by 8:30 a.m. on the morning of her visit to confirm that she will be attending, due to accruing 3 no-call/no-shows for visits. On December 13, 2021, Mother was placed on check-in status, meaning she must arrive one hour prior to the scheduled visit. The biggest concern with respect to visitation has been Mother's attendance. For 6 out of the 18 months the Child has been in placement, Mother has been incarcerated or otherwise unavailable for visits. During the 12 months that Mother was available for visits, she attended only 8 visits in-person, and 2 visits via Zoom, which occurred after the Petition for Involuntary Termination of Parental Rights was filed. When Mother did attend in-person visits, there were several instances where Mother nodded off or appeared to be under the influence. On other visits, Mother would have inappropriate conversations with the Child and when visitation staff made suggestions or requests Mother would become aggressive and curse at Agency staff. Ms. Wood noted that when Mother displayed these behaviors the Child seemed unaffected, leading Agency staff believe that he was accustomed to this type of behavior by Mother. When question by Trisha Hoover Jasper, Esquire, counsel for the Child, about why she failed to attend so many visits, Mother stated that she "hates CYS" and did not attend because she did not want to do what they wanted her to do rather than seeing how her absences affected her son.

The Child has been in care since May 19, 2021, and on August 12, 2022, this Court found that aggravated circumstances existed with respect to Mother in that she had had failed to maintain substantial and continuing contact with the Child for a period

9

of six months. This Court finds that she has demonstrated a settled purpose of relinquishing parental claim to the Child. Additionally, grounds for termination under 23 Pa.C.S. 2511(a)(1) may be proven where a parent fails to perform parental duties for a period in excess of six months prior to the filing of the Petition for Involuntary Termination of Parental Rights.

In determining what constitutes parental duties, the Pennsylvania Supreme Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent "exert himself to take and maintain a place of importance in the child's life."
>
> With these principles in mind, the question whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case. A finding of abandonment, which has been characterized as "one of the most severe steps the court can take," will not be predicated upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control. It may only result when a parent has failed to utilize all available resources to preserve the parental relationship.

**In re: Burns**, 379 A.2d 535, 540 (Pa. 1977) (citations omitted). The Agency was granted emergency custody of the Child on May 19, 2021, following an incident involving his infant brother which brought to light Mother's drug abuse and mental health concerns. The Child's greatest needs have been food, shelter, clothing, school attendance, medical care, and comfort. In order to satisfy her obligation to perform

10

parental duties, Mother would have to provide stable housing, ensure attendance at school, make and attend medical appointments, provide financial support for the Child, and comfort him when he was sick or scared. The Child was removed from Mother's care because of concerns about her ability to perform these parental duties adequately and consistently enough to ensure the Child's safety. Since the Child has been in care, Mother's performance of parental duties has been limited to the eight in-person visits Mother attended at the Agency. As Mother's visits never progressed beyond the "supervised" status, and Mother was often late, or aggressive at the visits, and stopped attending visits altogether in January of 2022, Mother cannot be said to have performed her parental duties. The Court hereby finds by clear and convincing evidence that the Agency has fulfilled the requirements of 23 Pa.C.S. §2511(a)(1) in that Mother has both evidenced a settled purpose of relinquishing parental claim to the Child and failed to perform her parental duties for at least six months prior to the filing of the termination petition.

To satisfy the requirements of Section 2511(a)(2), the Agency must demonstrate that Mother, through:

> (1) [R]epeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

**In re: Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa. Super. 2003.)

Under Section 2511(a)(2), "[t]he grounds for termination [of parental rights] due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." **In re: A.L.D.**, 797 A.2d 326, 337

11

(Pa. Super. 2002) (citations omitted). "Moreover, an agency is not required to provide services indefinitely if a parent is either unable or unwilling to apply the instruction given." **Id.** at 340. "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. ... [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." **Id.**, *quoting* **In re J.W.**, 578 A.2d 952, 959 (Pa. Super. 1990).

Long before the Child was placed in the legal and physical custody of the Agency and removed from Mother's home, the Agency was involved with this family. Tara Longenberger, ongoing unit supervisor for the Agency, testified that there have been 21 GPS reports/allegations and 6 CPS reports against Mother, 2 of which had indicated findings. In one instance, Mother was found to have given her teenage daughter Percocet and used her daughter's urine for drug screens. The other indicated report arose from the incident where Mother was under the influence and unresponsive while her infant screamed in distress, which ultimately led to this Child being adjudicated dependent.

While their services were still voluntary, the Agency connected Mother with community resources such as STEP for transportation, LIHEAP, Evening Children's Services, and West End Community Church for help with clothing and diapers. Agency representatives spoke to Mother many times about mental health services. Mother continually missed appointments with Crossroads Counseling, Medically Assisted Treatment, and Addiction Medicine, resulting in her being discharged from these resources. In November of 2020, Mother gave birth to a child who was born addicted. Heroin, cocaine, benzodiazepine,

12

hydrocodone, and fentanyl were all noted in his system. In December of 2020, Mother went to detox, and was going to go to rehab, but was discharged for noncompliance, refusing to sign paperwork or participate in treatment, and for being hostile to facility staff. In September of 2021, after admitting to using cocaine, West Branch Drug & Alcohol Abuse Commission ("WBDA") had a bed on hold for Mother in an in-patient treatment facility but Mother indicated she was not ready and refused to take advantage of the opportunity.

Corey Burkholder, Outreach Services caseworker, testified that he had been working on and off with Mother since 2012. Since the Child's birth, Mother had four voluntary referrals for services including housing, budgeting, employment, and connecting to community supports. One referral was closed due to Mother meeting her goals, but the remaining referrals were closed either at Mother's request or because Mother did not make progress. Mother's drug use was an ongoing concern and often inhibited her ability to work towards her goals. Mr. Burkholder testified that over 50% of the times he would attempt to meet with Mother she was under the influence and Mother's teenage daughter would take over the parental responsibilities for Mother's three younger children, so even when Mother was "parenting" she was not performing parental duties. Mother's teenage daughter was often truant because she was unable to make school a priority due to having to parent Mother's other three children while Mother was using drugs.

On September 13, 2021, another referral was made pursuant to the current dependency action, with the goals being parenting, budgeting, and connection to community resources. Mr. Burkholder testified that when he was

13

able to meet with Mother, she was cooperative but her active addiction caused her to struggle with working towards and completing her goals. On multiple occasions Mother was referred for out-patient counseling but she struggled to make appointments.

Pompey Suggs, ongoing caseworker for the Agency, testified that he was assigned this case in March of 2022. Throughout the Agency's involvement with the family, it provided Mother a significant amount of financial support to enable her to keep her home. Additionally, when Mother was incarcerated, her teenage daughter worked multiple jobs to pay the rent. Attempts were made to secure employment for Mother where her daughter worked but that was unsuccessful. In May of 2022 Mother was evicted from her home and admitted to Mr. Suggs that she was actively using illegal substances. Mother then stayed with various friends until the Agency helped her obtain alternate housing prior to her entering inpatient treatment in September of 2022. Mr. Suggs testified that he, too, made multiple attempts to get Mother treatment for her addiction issues and set up several appointments through WBDA which Mother failed to attend. Every time Mr. Suggs requested Mother submit to a random drug screen, Mother would refuse.

"When a child is in foster care, this affirmative duty requires the parent to work towards the return of the child by cooperating with the Agency to obtain rehabilitative services necessary for them to be capable of performing their parental duties and responsibilities." **In re: G.P.-R.,** 851 A.2d 967, 977 (Pa.Super. 2004). Before, and during the time that the Child has been in foster care, the Agency has attempted to connect Mother with services that would

14

rehabilitate her and provide her with the resources and skills necessary to enable her to perform her parental duties and responsibilities. Whether it was due to her addiction or her unwillingness to cooperate with the Agency, Mother repeatedly failed to take advantage of the services offered to her. The Court finds by clear and convincing evidence that the Agency has satisfied 23 Pa.C.S. §2511(a)(2) by demonstrating Mother's repeated and continued incapacity has caused the Child to be without essential parental control or subsistence necessary for his physical and mental well-being.

"Termination of parental rights under Pa.C.S. § 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." **In re: K.J.,** 936 A.2d 1128, 1134 (Pa. Super. 2007).

Similarly, to terminate parental rights pursuant to 23 Pa.C.S. § 2511(a)(8), the following factors must be demonstrated: "(1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." **In re: Adoption of M.E.P.,** 825 A.2d 1266, 1275-76 (Pa. Super. 2003) "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." **In re: A.R.,** 837 A.2d 560, 564 (Pa. Super. 2003). After the 12-month period has been established, the Court must next determine whether the conditions necessitating placement persist, despite the reasonable good faith efforts that the agency supplied over a

15

realistic time period. **Id.** In terminating parental rights under Section 2511(a)(8), the trial court is not required to evaluate a parent's current "willingness or ability to remedy the conditions that initially caused placement". **In re: Adoption of T.B.B.**, 835 A.2d at 396 (Pa. Super. 2003); **In re: Adoption of M.E.P.**, 825 A.2d at 1276.

The Court finds that the Agency has proven by clear and convincing evidence that grounds for termination of Mother's parental rights exist under both Sections 2511(a)(5) and (8). The Child was placed in the legal and physical custody of the Agency on May 19, 2021, and has been in Agency's custody ever since. At each of the permanency review hearings for the Child, Mother was found to have minimal or no compliance with the permanency plan and made no progress towards alleviating the conditions which necessitated the Child's placement. In September of 2022, more than 15 months after the Child was removed from her care and 8 months since her last in-person visit with the Child - and one month after the Agency filed its Petition for Involuntary Termination of Parental Rights - Mother chose to enter Guadenzia House to receive in-patient services relative to her drug use. Despite numerous attempts over the years by the Agency to connect her with services designed to address her addiction and mental health concerns, Mother's decision to enter in-patient treatment was at least partially attributable to wanting to avoid being incarcerated again.

At the time of the hearing, Mother had 144 days of sobriety and testified that she had never been clean for that length of time or had that combination of treatment. In addition to substance abuse counseling, Mother testified that she receives parenting, trauma, behavioral therapy, and grief counseling at her

16

treatment facility, and has been taking medication for anxiety and depression. While this Court commends Mother for her recent efforts to address her addiction and mental health issues, she is in the early stages of recovery, has a young child in her custody and is currently pregnant with another child. Although she will leave Guadenzia House with an aftercare plan which includes intensive outpatient trauma, mental health, and substance abuse counseling, there is no guarantee that Mother will be able to meet the Child's needs immediately or even within a reasonable amount of time. Mother would need to demonstrate that she is able to obtain and maintain employment, housing, sobriety, and consistent visitation for several months in the community prior to being reunified with the Child. Since at least May 19, 2021, Mother has been unable or unwilling to provide the Child with food, shelter, clothing, medical care and comfort, and has not ensured that he attended school. During this time, the Child has had all of those tangible and intangible needs met by his resource family, and has flourished in a home free from drug abuse and filled with love and support. This Court is unwilling to further delay the Child's permanency based on Mother's promise that she will be an appropriate resource for the Child in the future. It is clear to this Court that termination of Mother's parental rights would best serve the needs and welfare of the Child.

As the Court has found that statutory grounds for termination have been met under all four subsections of 23 Pa. C.S. §2511(a) contained in the Petition to Involuntarily Terminate Parental Rights, the Court must now consider the following:

> 23 Pa.C.S. § 2511(b)  OTHER CONSIDERATIONS.—The Court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.

17

The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

The Court must take into account whether a bond exists between the child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. **In the Interest of C.S.**, supra, at 1202. When conducting a bonding analysis, the Court is not required to use expert testimony. **In re: K.K.R.-S.**, 958 A.2d 529, 533 (Pa. Super. 2008) (citing **In re: I.A.C.**, 897 A.2d 1200, 1208-1209 (Pa. Super. 2006)). In the present case, a bonding assessment between Mother and the Child was scheduled, but Mother failed to attend the appointment and was incarcerated prior to the assessment being rescheduled. It is clear to this Court that Mother loves the Child, and desires to have him returned to her custody. However, a parent's own feelings of love and affection for a child do not prevent termination of parental rights. **In re: L.M.**, 923 A.2d 505, 512 (Pa. Super. 2007). "Above all else . . . adequate consideration must be given to the needs and welfare of the children." **In re: J.D.W.M.**, 810 A.2d 688, 690 (citing **In re: Children M.**, 681 A.2d 793 (Pa. Super. 1996), appeal denied, 546 Pa. 674, 686 A.2d 1307 (1996)).

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the *intangible* dimension of the needs and welfare of a child--the love, comfort, security and closeness--entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the children's needs and welfare, must examine the status of the natural parental bond to consider whether

18

terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

**In the Interest of C.S.**, supra., at 1202 (citations omitted).

When a child is removed from the home and placed in foster care, the scheduled visits become extremely important as they serve to allow the parent to maintain the parent/child bond as the parent works towards reunification. Mother attended only 8 in-person visits when she was not incarcerated or in treatment. Mother's only contact with the Child since January 19, 2022, has been two 15 minute visits via Zoom while at her treatment facility. It is notable that during the first Zoom visit Mother became aggressive and cursed at the Agency staff, causing them to terminate the call and during the second Zoom visit the Child did not appear eager to engage with Mother.

Mother argues that it is in the Child's best interest to be returned to her so that he does not grow up to be the one child that is separated from his biological siblings, and there is no reason to "break up" her family now considering the progress she has made since entering treatment. First, it must be noted that one of the Child's siblings has been placed with his biological father's family and does not reside with Mother or the other siblings. Also, Mother's oldest child has now reached the age of majority and is not under Mother's care. Additionally, Mother was unable or unwilling to address her substance abuse and mental health issues prior to the Child having to be removed from her care, and her delay in taking advantage of the visits and supports offered to her has caused any bond there may have been between Mother and the Child to deteriorate. Although Mother testified that she has addressed her addiction and mental health issues and intends to provide the Child with a loving, stable home, this cannot overcome the fact that someone other than Mother has been meeting the Child's needs

19

for nearly two years, and possibly longer given the amount of parental duties Mother's teenage daughter assumed while Mother did nothing to address her drug abuse.

The Child is currently in a loving and stable home. He regularly attends school, church, sporting, and social activities. The Child's foster parents have made and attended all of the Child's medical appointments. This type of consistency and follow-through that has allowed the Child to thrive while in their care is exactly what Mother lacked the motivation to achieve. The Child's attorney, Trisha Hoover Jasper, Esquire, informed the Court that the Child smiles when they talk about adoption and he likes being a part of his resource family. The Guardian Ad Litem, Angela Lovecchio, Esquire, opined that it is in the best interest of the Child to have stability, consistency, attend school daily, and to not have to be afraid of whether his Mother will use drugs.

The foster parents have provided everything the Child needs while Mother could not or would not and this has naturally established a bond and attachment between the Child the foster parents which is not present between the Child and Mother. The Child's permanency cannot and should not be delayed in the hopes that Mother will be able to maintain her sobriety long enough to establish the consistency in her employment, housing, and visitation that would be required prior to reunification with the Child. The Child is clearly bonded with the resource parents and their children, who have provided for his physical, emotional, educational, and social needs, and who are willing to offer him permanency. The Court is satisfied that termination of Mother's parental rights would not cause irreparable harm to the Child. This Court further finds that permanency in the form of adoption by the current foster parents is in the best interest of the Child.

20

## Conclusions of Law

1.  The Court finds that the Agency has established by clear and convincing evidence that Donuae Murray-Kellam, by conduct continuing for a period of at least six months immediately preceding the filing of the petition has failed to perform parental duties pursuant to 23 Pa.C.S. §2511(a)(1).

2.  The Court finds that the Agency has established by clear and convincing evidence that Donuae Murray-Kellam, has exhibited repeated and continued incapacity, abuse, neglect or refusal which has caused the Child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by her pursuant to 23 Pa.C.S. §2511(a)(2).

3.  The Court finds that the Agency has established by clear and convincing evidence that the child has been removed from Donuae Murray-Kellam's care for a period of at least six months, that the conditions which led to the removal or placement of the child continue to exist, that the conditions which led to the removal or placement of the child are not likely to be remedied within a reasonable period of time, and that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. §2511(a)(5).

4.  The Court finds that the Agency has established by clear and convincing evidence that the child has been removed from Donuae Murray-Kellam's care for a period of twelve months or more, that the conditions which led to the removal or placement of the child continue to exist, and that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. §2511(a)(8)

21

5.      The Court finds that the Agency has established by clear and convincing evidence that the developmental, physical and emotional needs and welfare of the Child will be best served by the termination of Mother's parental rights pursuant to 23 Pa.C.S. §2511(b).

Accordingly, the Court will enter the attached Decree.

By the Court,

Ryan M. Tira, Judge

RMT/jel
c.      John Pietrovito, Esquire
Jeana Longo, Esquire
Angela Lovecchio, Esquire
Trisha Hoover Jasper, Esquire
Children & Youth
CASA
Gary Weber, Esquire
Jennifer E. Linn, Esquire

22

## IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA
## ORPHANS' COURT DIVISION

IN RE:               :        NO. 2022-6825

                       :

DEJAHN KELLAM-MURRAY,   :
   Minor child          :

### *DECREE*

**AND NOW**, this **22nd** day of **February, 2023**, after a hearing on the Petition for Involuntary Termination of the Parental Rights of Donuae Murray-Kellam, held on January 13, 2023, it is hereby ORDERED and DECREED:

(1)    That the parental rights of Donuae Murray-Kellam be, and hereby are, terminated as to the child above-named;

(2)    That the welfare of the child will be promoted by adoption; that all requirements of the Adoption Act have been met; that the child may be the subject of adoption proceedings without any further notice to the natural mother.

### NOTICE TO NATURAL PARENT

### PENNSYLVANIA ADOPTION MEDICAL HISTORY REGISTRY

This is to inform you about an adoption law provision relating to medical history information. As the birth parent of a Pennsylvania born child who is being, or was ever adopted in the past, you have the opportunity to voluntarily place on file medical history information. The information which you choose to provide could be important to this child's present and future medical care needs.

The law makes it possible for you to file current medical information, but it also allows you to update the information as new medically related information becomes available. Requests to release the information will be honored if the request is submitted by a birth child 18 years of age or older. The law also permits that the court honor requests for information submitted by the adoptive parents or legal guardians of adoptees who are not yet 18 years of age. All information will be maintained and distributed in a manner that fully protects your right to privacy.

23

You may obtain the appropriate form for you to file medical history information by contacting the Adoption Medical History Registry. Registry staff are available to answer your questions. Please contact them at:

Department of Human Services
Pennsylvania Adoption Information Registry
P.O. Box 4379
Harrisburg, PA 17105-17111
Telephone: 1-800-227-0225

Medical history information forms may also be obtained locally by contacting one of the following agencies:

1. County Children & Youth Social Service Agency
2. Any private licensed adoption agency
3. Register & Recorder's Office
4. Online at www.adoptpakids.org/Forms.aspx

By the Court,

Ryan M. Tira, Judge

RMT/jel
cc. John Pietrovito, Esquire
Jeana Longo, Esquire
Angela Lovecchio, Esquire
Trisha Hoover Jasper, Esquire
Children & Youth
CASA
Gary Weber, Esquire
Jennifer E. Linn, Esquire